UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:21-CV-00565-CHL

KATRINA E.,[1]                                                            Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,                              Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Complaint filed by Plaintiff, Katrina E. ("Claimant").  Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").  (DN 1.)  Claimant and the Commissioner each filed a Fact and Law Summary.  (DNs 13, 21.)  The Parties have consented to the jurisdiction of a Magistrate Judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed.  (DN 11.)  Therefore, this matter is ripe for review.

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED**.

I.    **BACKGROUND**

On or about February 6, 2018, Claimant filed an application for disability insurance benefits ("DIB") and on or about March 9, 2018, Claimant filed two applications for child's insurance benefits ("CIB") pursuant to Title II of the Social Security Act; in all applications, Claimant alleged disability beginning on January 1, 2010.  (R. at 26, 51, 77, 124, 132, 140, 149-51, 153, 163, 174.)  On April 16, 2020, Administrative Law Judge ("ALJ") Dwight Wilkerson ("the ALJ") conducted a hearing on Claimant's applications.  (*Id.* at 100-123.)  On April 28, 2020, the ALJ issued three separate decisions on Claimant's applications in all of which he engaged in

---

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.

the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled. (*Id.* at 22-99.)

As to Claimant's DIB application, the ALJ made the following partially favorable findings:

1. The claimant meets the insured status requirements of the Social Security Act from April 1, 2017 through June 30, 2018. (*Id.* at 28.)

2. The claimant has not engaged in substantial gainful activity since the alleged onset date. (*Id.*)

3. At the time of the claimant's date first insured, April 1, 2017, the claimant had the following severe impairments: Attention Deficit Hyperactivity Disorder; Cognitive Disorder; Depression; and Anxiety. Beginning on the established onset date of disability, May 1, 2017, the claimant has had the following severe impairments: Schizoaffective Disorder; Major Depressive Disorder with Psychosis; Attention Deficit Hyperactivity Disorder; and Cognitive Disorder. (*Id.* at 29.)

4. Prior to May 1, 2017, the date the claimant became disabled, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.* at 30.)

5. [P]rior to May 1, 2017, the date the claimant became disabled, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant was able to able to perform simple and some detailed tasks in a lower stress work environment without strict quotas or fast-paced or frequent changes or frequent social interaction. (*Id.* at 32.)

6. The claimant has no past relevant work. (*Id.* at 37.)

7. Prior to the established disability onset date, the claimant was a younger individual age 18-49. (*Id.*)

8. The claimant has at least a high school education and is able to communicate in English. (*Id.*)

9. Transferability of job skills is not an issue in this case because the claimant does not have past relevant work. (*Id.*)

10. Prior to May 1, 2017, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in

significant numbers in the national economy that the claimant could have performed.  (*Id.*)

11.    Beginning on May 1, 2017, the severity of the claimant's impairments has met the criteria of section 12.03 of 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.* at 38.)

12.    The claimant was not disabled prior to May 1, 2017, but became disabled on that date and has continued to be disabled through the date of this decision.  (*Id.* at 41.)

As to Claimant's CIB applications, the ALJ made the following unfavorable findings:

1.    [T]he claimant had not attained age 22 as of January 1, 2010, the alleged onset date.  (*Id.* at 53, 79.)

2.    The claimant has not engaged in substantial gainful activity since January 1, 2010, the alleged onset date.  (*Id.* at 53, 79.)

3.    Prior to attaining age 22, the claimant had the following severe impairments: Attention Deficit Hyperactivity Disorder; Cognitive Disorder; Depression; and Anxiety.  (*Id.* at 53, 79.)

4.    Prior to attaining age 22, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.* at 54, 80.)

5.    [P]rior to attaining age 22, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant was able to able to perform simple and some detailed tasks in a lower stress work environment without strict quotas or fast-paced or frequent changes or frequent social interaction.  (*Id.* at 55-56, 81-82.)

6.    The claimant has no past relevant work.  (*Id.* at 66, 92.)

7.    The claimant . . . was 18 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.* at 66, 92.)

8.    The claimant has at least a high school education and is able to communicate in English.  (*Id.* at 66, 92.)

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work.  (*Id.* at 66, 92.)

10.     Prior to attaining age 22, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (*Id.* at 66, 92.)

11.     The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to . . . the date she attained age 22. (*Id.* at 67, 93.)

Claimant subsequently requested an appeal to the Appeals Council, which denied her request for review on July 16, 2021. (*Id.* at 1-6, 382.) At that point, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 422.210(a) (2022); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision). Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later. 20 C.F.R. § 422.210(c). Accordingly, Claimant timely filed this action on September 9, 2021. (DN 1.)

## II.     DISCUSSION

The Social Security Act authorizes payments of DIB to persons with disabilities. *See* 42 U.S.C. §§ 401-434. An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a) (2022). The Social Security Act also authorizes payments of CIB to children of insured wage earners under certain circumstances including when a child of wage earner is or was under a disability before he or she attained age twenty-two. 42 U.S.C. § 402(d); 20 C.F.R. § 404.350 (2022). To be entitled to benefits on the basis of disability, in addition to the other requirements of the act, a child must also prove that he or she is disabled as defined above. 42 U.S.C. § 402(d)(1)(B)(ii).

### A.      Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the Court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way").  However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B.      Five-Step Sequential Evaluation Process for Evaluating Disability

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled.  20 C.F.R. § 404.1520 (2022).  This same process applies to the evaluation of disability for CIB claims under Title II.  42 U.S.C. § 402(d)(1)(B)(ii) (incorporating the same definition of disability under 42 U.S.C. § 423(d) that the regulations in 20 C.F.R. Part 404 are designed to govern).  In summary, the evaluation process proceeds as follows:

(1)    Is the claimant involved in substantial gainful activity?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," proceed to the next step.

(2)    Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[2] and significantly limits his or her physical or mental ability to do basic work activities?  If the answer is "no," the claimant is not disabled.  If the answer is "yes," proceed to the next step.

(3)    Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1?  If the answer is "yes," the claimant is disabled.  If the answer is "no," proceed to the next step.

(4)    Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work?  If the answer is "yes," then the claimant is not disabled.  If the answer is "no," proceed to the next step.

(5)    Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," the claimant is disabled.

20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof with respect to steps one through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.    Claimant's Contentions

Claimant argued that the ALJ erred in several ways.  In general, she challenged the ALJ's determination of her disability onset date in all three decisions and argued that the ALJ should

---

[2] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months.  20 C.F.R. § 404.1509 (2022).

have found she was disabled before she turned twenty-two.  (DN 13, at PageID # 2688-89.)  She argued that the ALJ's Listing analysis was incorrect because the ALJ incorrectly assessed the paragraph B criteria.  (*Id.* at 2689-90.)  She also argued that the ALJ erred in his RFC analysis in several ways including in failing to incorporate a narrative discussion to support his conclusion that she could perform some detailed tasks, failing to include a narrative discussion to support a lack of additional limitations related to her processing time abnormality, not addressing the combined effects of her impairments, incorrectly assessing her daily activities, incorrectly assessing the persuasiveness of the medical opinions in the record, and in failing to consider a *res judicata* issue.  (*Id.* at 2690-98.)  She claimed that these errors in the ALJ's determination of her RFC caused errors at later steps.  (*Id.* at 2699.)  The Court will address these arguments below.

### 1.    Listings

Claimant argued that the ALJ erred in his analysis of the Listings.  (DN 13, at PageID # 2689-90.)  At step three of the five-step evaluation process, the ALJ considers whether the claimant has an impairment that satisfies the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, which are generally referred to as the "Listings."  20 C.F.R. § 404.1520(a)(4)(iii).  "[A] claimant who meets the requirements of a listed impairment will be deemed conclusively disabled."  *Rabbers v. Comm'r Soc. Sec. Admin.,* 582 F.3d 647, 653 (6th Cir. 2009).  A claimant's impairment satisfies a Listing only when the claimant manifests the specific requirements described in the Listing's medical criteria.  20 C.F.R. § 404.1525(d) (2022).  To meet the requirements of a listed impairment or its equivalent, a claimant must demonstrate specific findings that duplicate the enumerated criteria of the listed impairment.  *Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 529 (6th Cir. 2006); *see also Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific

medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."). The claimant bears the burden of proving his or her impairment satisfies all the specified criteria in a given Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Given that there are so many potential Listings, the regulations do not require an ALJ to address every Listing in his or her findings. *Sheeks v. Comm'r Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). If "the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014). A "substantial question" requires the claimant to "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. Without such evidence, the ALJ "does not commit reversible error by failing to evaluate a listing at Step Three." *Id*. at 433.

As a starting point, the Court notes Claimant's argument is patently deficient. Though Claimant attacked the ALJ's analysis of the paragraph B criteria, Claimant did not separately demonstrate that she met all criteria of any particular Listing as required to raise a substantial question. She did not even specify which of the 12.00 Listings considered by the ALJ that she could satisfy if the ALJ's paragraph B analysis had been different. These errors alone are a reason to deny her requested relief.

However, the Court also finds her claims of error in the ALJ's paragraph B analysis to be without merit. Across all three decisions, the ALJ considered whether Claimant met the requirements of Listings 12.04, 12.06, or 12.11, and found that prior to May 1, 2017, Claimant did not. (R. at 30-32, 54-55, 80-81.) To meet the requirements of some of the mental disorders listed

in Section 12.00, claimants must typically also have a particular level of limitation on their mental functioning in four areas that are referred to as the paragraph B criteria. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00E (eff. Mar. 14, 2018, to Apr. 1, 2021) (Westlaw). Those four criteria are a claimant's ability to "[u]nderstand, remember, or apply information"; "[i]nteract with others"; "[c]oncentrate, persist, or maintain pace"; and "[a]dapt or manage oneself." *Id.* The ALJ found that Claimant had no greater than moderate limitations in any of these areas prior to May 1, 2017. (R. at 30-32, 54-55, 80-81.) In his DIB decision, as to each criterion, the ALJ stated,

> While the undersigned finds sufficient evidence to establish severe impairment, there is scant medical evidence to potentially establish any greater than moderate limitation prior to May 2017. There are persistent findings of anxious mood with an abnormal flat affect over the course of multiple office visits in 2016 and in January 2017 that is reasonably expected to have persisted through April 2017. However, those same records also show otherwise repeatedly within normal limits objective mental status findings, including appropriate alertness, orientation and activity, good insight and judgment and normal recent and remote memory. (*See*, 11F/41-33; 26F/26-45). As discussed more fully below, while there are allegations of significant difficulties and some limitation is consistent with the claimant's mental impairments, the undersigned is persuaded that medical and other evidence, shows that the claimant was, for the most part, able to [understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt and manage herself] in an independent, appropriate and effective manner and weighs against finding greater than moderate limitation in this domain.[3]

(*Id.* at 30-32.) In his CIB decisions, the ALJ stated,

> As discussed more fully below, while there are allegations of significant difficulties and some limitation is consistent with the claimant's mental impairments, the medical and other evidence documents overall adequate functioning with the benefit of routine conservative treatment with prescribed medication and some academic accommodations. This shows that the claimant was, for the most part, able to [understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt and manage herself] in an independent, appropriate, and effective manner and weighs against finding greater than moderate limitation in this domain.[4]

---

[3] The ALJ repeated this paragraph for his analysis of each of the paragraph B criteria and just changed the bracketed language to refer to the relevant criterion.

[4] Again, as in his DIB decision, the ALJ repeated this paragraph for his analysis of each of the paragraph B criteria and just changed the bracketed language to refer to the relevant criterion.

(*Id.* at 54-55, 80-81.)  A moderate limitation is defined as one where a claimant's "functioning in [an] area independently, appropriately, effectively, and on a sustained basis is fair."  20 C.F.R. § Part 404, Subpart P, App. 1, § 12.00F(2)(c).  Claimant criticized the ALJ for engaging in "generalities of scant evidence" and pointed to evaluations cited elsewhere in the record as to the period prior to March 2017 that she claimed supported an extreme limitation on her ability to maintain concentration, persistence, and pace.  (DN 13, at PageID # 2689 (citing R. at 521, 532, 534, 536-38, 547-51, 559-60, 569, 596).)  An extreme limitation is two steps up from the moderate limitation the ALJ imposed and is defined as a complete inability to function in an area.  20 C.F.R. § Part 404, Subpart P, App. 1, § 12.00F(2)(e) ("Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.").  Though Claimant acts as if the ALJ ignored the evidence she cited in the record, the ALJ explicitly considered Claimant's cited evidence in his discussion of Claimant's RFC, a discussion he incorporated to support his analysis of the paragraph B criteria.  (R. at 30-32, 54-55, 80-81 (noting that his generalization will be "discussed more fully below").)  Based on the Court's review of the relevant records, the ALJ's generalizations regarding Claimant's medical records before May 1, 2017, accurately reflect the content of those records and in particular support his conclusions in his RFC analysis regarding Claimant's stability while on medication.  As to the many evaluations in the record, and as the Court will set forth more fully below, the ALJ discussed these evaluations in his CIB RFC analysis and adequately explained why he found certain opinion evidence persuasive.  While it would have undoubtedly been more useful for the ALJ to provide an individualized analysis of the relevant paragraph B criteria, especially in view of the ALJ's incorporation of his RFC analysis, Claimant has not demonstrated any specific error.  In particular, given the ALJ's RFC discussion, Claimant has not demonstrated why the records she claimed

would have resulted in an extreme limitation as opposed to a marked or moderate one. Claimant's arguments regarding the ALJ's paragraph B criteria ultimately amount to nothing more than disagreement about how to weigh the evidence of record. Because the ALJ's discussion is supported by substantial evidence, the Court finds that Claimant has failed to demonstrate reversible error.

### 2. RFC

An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c) (2022). The ALJ bases his or her determination on all relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(1)-(4). Thus, in making his or her determination of a claimant's RFC, an ALJ must necessarily evaluate the persuasiveness of the medical opinions in the record and assess the claimant's subjective allegations. 20 C.F.R. §§ 404.1520c, 404.1529 (2022). Claimant argued that the ALJ made multiple errors in his determination of her RFC, including in failing to incorporate a narrative discussion to support his conclusion that she could perform some detailed tasks, failing to include a narrative discussion to support a lack of additional limitations related to her processing time abnormality, not addressing the combined effects of her impairments, incorrectly assessing her daily activities, incorrectly assessing the persuasiveness of the medical opinions in the record, and in failing to consider a *res judicata* issue. (DN 13, at PageID # 2690-98.) The Court will consider these arguments more fully below.

### a) Narrative Discussion Regarding Ability to Perform Detailed Tasks and Lack of Limitations Related to Processing Time Abnormality

Claimant argued that the ALJ erred in failing to include a sufficient narrative discussion to support his conclusion that she could perform "some detailed tasks" and in failing to include

discussion regarding his decision not to adopt limitations related to her processing time abnormality citing SSR 96-8p.  (DN 13, at PageID # 2690-95.)  SSR 96-8p states that an ALJ's assessment of a claimant's RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 61 Fed. Reg. 34474, 34478 (July 2, 1996).  It requires an ALJ's RFC finding to address in a function-by-function evaluation both the exertional and nonexertional capabilities of an individual.  *Id.* at 34476-77.  Exertional limitations relate to an individual's ability to sit, stand, walk, lift, carry, push, and pull.  *Id.* at 34477.  Nonexertional limitations relate to an individual's potential postural, manipulative, visual, communicative, and mental limitations and ability to tolerate various environmental factors.  *Id.* However, "case law does not require the ALJ to discuss those capacities for which no limitation is alleged."  *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (per curiam); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013).

As noted above, the ALJ found that Claimant was disabled on or after May 1, 2017, because after that time she met the requirements of Listing 12.03.  (R. at 26-27, 38-41.)  Claimant argued that the ALJ should have found her disabled before that date; thus, the only relevant records and parts of the ALJ's analysis for the purposes of the instant opinion are those interpreting evidence of her functioning on or before May 1, 2017.  There is comparatively less medical evidence in the record regarding this period than there is for the period after May 1, 2017, approximately 323 pages of the former versus approximately 2,108 pages of the latter.  (*Compare id.* at 520-630, 635-77, 744-92, 2311-27, 2442-92, 2507-58, with *id.* at 632-35, 678-743, 793-2310, 2328-2441, 2494-2506, 2559-2628.)  The records from before May 1, 2017, are comprised largely of primary care records, education records, and several neuropsychological evaluations that were largely

completed for the purposes of addressing her intellectual and academic functioning.  (*Id.* at 520-630, 635-77, 744-92, 2311-27, 2442-92, 2507-58.)  There are no specific psychological treatment records or hospital records from this period in the administrative record.  As Claimant emphasized a number of these records in her brief, the Court will briefly summarize the relevant evidence before addressing the ALJ's analysis and conclusions.

The administrative record contains a number of neuropsychological evaluations from the period prior to May 1, 2017, that focused on Claimant's ability to perform in an academic setting. On March 19, 1999, she was evaluated by Barbara J. Kinney, M.A., ("Kinney").  (*Id.* at 521-33.) Claimant was eight years old and in first grade at the time of their evaluation.  (*Id.* at 521.)  The evaluation's stated purpose was "to determine her current level of intellectual and academic functioning."  (*Id.*)  After administering a number of tests, Kinney concluded that Claimant had a low average range of intellectual functioning, average motor skills, poor listening comprehension skills, below average to poor oral expression skills, and significant difficulties with inattention both at school and at home."  (*Id.* at 532.)  While Kinney found that Claimant had no particular learning disability, she concluded that she would "struggle more than her academic peers in learning, retaining, and retrieving information" and that she would "need a significantly greater amount of time to accomplish tasks than her academic peers."  (*Id.*)  Kinney found the evidence consistent with a diagnosis of Attention Deficit/Hyperactivity Disorder, Predominantly Inattentive Type ("ADHD") and noted that Claimant had previously been diagnosed with central auditory processing disorder.  (*Id.* at 522, 532.)

In 2003, Claimant was evaluated by Byron White, Psy.D. ("Dr. White").  (*Id.* at 536-46.) Claimant was twelve years old and about to enter sixth grade at the time of the evaluation.  (*Id.* at 536.)  The report noted that Claimant "was referred for evaluation due to concern over a variety of

cognitive issues." (*Id.*)  Dr. White found that Claimant would likely have "pronounced difficulties" in meeting the demands of a traditional academic setting. (*Id.* at 537.)  He found that her test scores in the areas of auditory processing, expressive language, speed of information processing, verbal memory, attention, and concentration were in the "borderline" range and were "areas of concern." (*Id.* at 536-37.)  He found that she needed a number of academic accommodations including special seating in the classroom near her teacher, "assistance in organizing her approach to assignments," and additional time to complete reading or writing tasks of up to time-and-a-half to two times that of her peers due to her slower processing speed. (*Id.* at 538.)  He also found that Claimant would likely benefit from "use of a stimulant medication." (*Id.*) He noted that her grades were "okay" and were primarily B's, C's, and some D's. (*Id.* at 540.)  In his examination of her mental status, he noted that she was oriented to time, place, and person; had a mood that fluctuated from happy to excited, sad, or agitated; had periods of depression; got adequate sleep, and showed no signs of overt or covert psychosis. (*Id.* at 541.)  He emphasized that her overall intellect was in the borderline to low average range and that her reasoning and judgment skills were below expected. (*Id.*)

Dr. White evaluated Claimant again in 2006 when Claimant was fifteen years old and about to enter ninth grade. (*Id.* at 547, 547-57.)  He again noted that Claimant would likely have difficulty meeting the demands of an academic setting and would need time-and-a-half to two times more time than her peers to complete tasks. (*Id.* at 548.)  He noted Claimant's ADHD diagnosis and that her scores on his testing "suggest[ed] that pharmacologic intervention has been beneficial in stabilizing focus." (*Id.*)  He specifically found that "[i]n the areas of attention and concentration, focus was believed to be equal to peers when [Claimant] is on medication, but was lower than peers prior to beginning pharmacologic intervention." (*Id.* at 552.)  He again made a

number of recommendations regarding accommodations that Claimant should receive in an academic setting, several of which overlapped with his prior recommendations.  (*Id.* at 548-51.)  In his examination of her mental status, he again noted that she was orientated to time, place, and person; had fluctuating mood; reported no hallucinations; was in the borderline range for overall intellect; and that her reasoning and judgment skills were below what was expected for her age.  (*Id.* at 553.)  In a 2007 addendum to his 2006 evaluation when Claimant was sixteen years old and in tenth grade, Dr. White again emphasized that Claimant's processing speed was slower than her pers and that the scores obtained during additional testing he performed at that time suggested that Claimant would "have significant difficulties meeting academic demands if information ha[d] to be processed at the same speed as peers."  (*Id.* at 558, 558-60.)  He found that "[c]urrent testing indicate[d] significant issues with speed of information processing for complex information."  (*Id.* at 558.)

On November 14, 2008, while Claimant was in eleventh grade, she was evaluated by Kevin Stevenson, M.Ed. ("Stevenson"), due to difficulties she was experiencing at school.  (*Id.* at 569-79.)  While Stevenson was skeptical that Claimant met the criteria for a diagnosis of ADHD, he did note that Claimant was performing below average in terms of her general intellectual ability and that it took her an extreme amount of time and effort to complete classwork and homework.  (*Id.* at 570, 573-74.)

On January 25, 2010, while Claimant was eighteen years old and in her senior year of high school, Claimant was evaluated by Jack Teeple, Psy.D. ("Dr. Teeple").  (*Id.* at 580-88, 2311-19.)  The stated purpose for the evaluation was "to clarify present diagnoses, if existent, assess her academic and vocational aptitudes and generate recommendations as to what might be feasible pursuits for her and whether further academic accommodations would be applicable."  (*Id.* at 580,

2311.)  Dr. Teeple noted that Claimant was taking Concerta for her ADHD and had done so fairly regularly since elementary school.  (*Id.* at 581, 2312.)  He noted that Claimant had received numerous accommodations in school including sitting up front, getting directions both orally and in writing, getting redirection to help her stay on task, permission to tape her lectures, the ability to dictate her answers, peer tutoring, and additional/extended time on tests.  (*Id.*)  Her GPA was 2.5 and she had previously received a 16, 1, and 15 respectively on the math, science, and reading portions of the ACT.  (*Id.*)  He found that her general intellectual functioning was on the cusp of the borderline and low average ranges.  (*Id.* at 583, 2314.)  He found that her scores on the Brown ADD Scales were "at, or below, the level of clinical significance, indicating minimal symptoms [we]re now present" but emphasized that because Claimant's symptoms were mitigated by Concerta, a continued diagnosis of ADHD was appropriate.  (*Id.* at 585, 2316.)  He noted that Claimant's grades were average and that as a senior she was performing in the sixth to seventh grade range in terms of academic skills.  (*Id.* at 586, 2317.)  He encouraged Claimant to apply for college but found that she would need similar accommodations to those she received in high school, especially extended test-taking time, to be successful.  (*Id.*)  However, on the portion of his evaluation labeled "Functional Limitations Worksheet" he marked that in terms of "work tolerance" Claimant had "no issues" though her "work/school skills" were marked "compromised by ADD symptoms."  (*Id.* at 587, 2318.)  He provided no separate or specific analysis to support these opinion regarding functional/work-related limitations.

Claimant was evaluated again on February 20, 2011, while she was nineteen years old, by Emily Brame, Psy. D. ("Dr. Brame").  (*Id.* at 561-68, 2320-27.)  Her evaluation noted that Claimant was referred "due to difficulties with memory, concentration and reading comprehension that have affected her performance at school and on standardized testing" and that the evaluation was

requested to determine if Claimant still met the criteria for ADHD and to assist with treatment planning.  (*Id.* at 561, 2320.)  Dr. Brame found that Claimant's ADHD diagnosis was still appropriate and that though Claimant's "[s]cores [we]re somewhat higher than expected due to the positive effects of her medication on attention," Claimant still had difficulties in learning information in verbal format.  (*Id.*)  Dr. Brame also found that a diagnosis of Major Depressive Disorder, Single Episode, Moderate was warranted based on Claimant's reports of emotional distress.  (*Id.*)  Dr. Brame reported that "[a]ll measures of attention and concentration, tracking and processing speed and working memory [we]re borderline or above."  (*Id.*at 562, 2321.)  Dr. Brame opined that "even when the subject is at her most focused, she will likely struggle with learning and retaining information that is presented in either oral or written formats."  (*Id.* at 563, 2332.)

The final evaluation in the record dated prior to May 1, 2017, was from Andrea Brown, MRC, CRC ("Brown"), who performed a vocational evaluation of Claimant on February 5, 2013. (*Id.* at 596-630.)  Brown noted that Claimant was twenty-one years old and that the purpose of her evaluation was to "determine appropriate vocational goals and degree programs for [Claimant] to consider."  (*Id.* at 596.)  Claimant reported that her current GPA was 2.5 and that she was receiving accommodations in college.  (*Id.* at 599.)  She also reported information regarding her high school performance that was not consistent with that reported in prior evaluations.  (*Id.* at 598.)  Brown noted that Claimant's vocational interests appeared to trend toward medical services, social services, or science.  (*Id.* at 600, 602.)  Brown found that nursing in particular would be a difficult career path for Brown given Claimant's delayed processing speed and recommended that Claimant look into careers that focused on indirect patient care.  (*Id.* at 602-03.)  Brown emphasized that Claimant would continue to need academic accommodations in whatever program she pursued. (*Id.* at 604.)

The medical evidence of record from prior to May 1, 2017, consists of what appear to be primary care records from the office of Dennis S. Gray, M.D. ("Dr. Gray"). (*Id.* at 635-77, 744-92, 2442-93, 2507-58.) Claimant saw several different nurse practitioners in Dr. Gray's office with visits dated between September 30, 2010, and January 30, 2017. (*Id.*) While the office did provide Claimant with a prescription for her ADHD medication, there do not appear to be any visits in the record specifically dedicated to her ADHD symptoms or to discussing her mental symptoms. Instead, Claimant was largely treated for annual exams, a number of urinary infections, and other acute conditions. However, during each visit between July 30, 2012, and August 8, 2014, her providers made notes in their physical examination of Claimant that reflected largely normal mental status findings including good judgment and insight, a normal mood and affect, and normal recent and remote memory, as well as that she was active, alert, and oriented to time, place, and person. (*Id.* at 769, 772, 776, 779, 784, 788, 791, 2467, 2470, 2474, 2477, 2481, 2485, 2488.) Beginning with Claimant's April 3, 2015, visit, her providers began to document normal mood with an abnormal/flat affect as part of their mental status findings but still documented good judgment and insight, normal recent and remote memory, and that Claimant was active, alert, and oriented to time, place, and person. (*Id.* at 746, 749, 752, 757, 759, 762, 765, 2444, 2447, 2450, 2455, 2457, 2460, 2463.) These records also contain numerous references to Claimant doing well generally and/or specifically doing well on her ADHD medications. (*Id.* at 757, 760, 763, 766, 769, 2455, 2458, 2461, 2464, 2467.) These are the only medical records dated prior to May 1, 2017.

The ALJ found that Claimant could "perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant was able to able to perform simple and some detailed tasks in a lower stress work environment without strict quotas or fast-paced or

frequent changes or frequent social interaction." (*Id.* at 32, 55-56, 81-82.)  In support of this finding, the ALJ cited to portions of nearly every exhibit in the medical records section of the administrative record.[5]  He cited to Claimant's own testimony regarding her limitations both in prehearing reports and during the hearing itself.  (*Id.* at 58, 84 (citing *id.* at 521-23) (McKinney 1999 evaluation); *Id.* at 58, 84  (citing *id.* at 536-46) (Dr. White 2003 evaluation); *Id.* at 59, 85 (citing *id.* at 547-60) (Dr. White 2006 and 2007 evaluations); *Id.* at 59, 85 (citing *id.* at 569-79) (Stevenson 2008 evaluation); *Id.* at 59-60, 85-86 (citing *id.* at 580-88, 2311-19) (Dr. Teeple 2010 evaluation); *Id.* at 60-61, 86-87 (citing *id.* at 561-68, 2320-27) (Dr. Brame 2011 evaluation); *Id.* at 61-62, 87-88 (citing *id.* at 594-630) (Brown 2013 evaluation).)   He also cited in support to Claimant's educational history, work history, and activities of daily living.  (*Id.* at 34 (citing *id.* at 395-98, 403-12, 437-45, 572, 594-630, 757, 760, 1434-35, 2455, 2458); *Id.* at 58, 84 (citing *id.* at 482-84); *Id.* at 59, 85 (citing *id.* at 481); *Id.* at 62, 88 (citing *id.* at 100-23, 396-98, 400, 403-12, 572, 690, 693, 698, 703, 739, 757, 760, 793-94, 1398, 1402, 1426, 2436-37, 2455, 2458); *Id.* at 63, 89 (citing *id.* at 100-23, 437-45, 594-630); *Id.* at 63-64, 89-90 (citing *id.* at 100-23, 395-98, 401).)   In his CIB decision, he summarized the period before Claimant turned twenty-two as follows:

> Importantly, throughout the period at issue from January 2010 to March 2013, while struggling with her academic pursuits despite receiving accommodations, the claimant appears to have maintained overall adequate mental functioning with minimal routine conservative treatment taking prescribed Concerta and having some recommendations and offers of treatment with additional prescribed medication and/or counseling but experienced no hallucinatory or other psychotic symptoms or acute episodes of decompensation, had no actual or recommended need for admission to inpatient psychiatric care and remained without suggested need for any other significant increase in the frequency, types or intensities of mental health treatment as are reflected in subsequent medical evidence beginning

---

[5] It appears the only exhibit the ALJ did not cite was Exhibit 7F containing lab records from Dr. Gray's office. However, the ALJ cited to the office visits contained in the primary care records from that office in Exhibits 11F and 26F.  (*Id.* at 34, 61-63, 87-88.)  Exhibit 26F contained laboratory records, a number of which overlapped with those contained in Exhibit 7F.  (*Compare id.* at 631-77, *with id.* at 2493-2562.)

with the initial manifestation of a schizoaffective disorder and major depressive disorder with psychosis in 2017.

(*Id.* at 62, 88). In both his DIB and CIB decision, he summarized of the overall period prior to May 1, 2017, that "[t]he claimant had severe mental impairments but maintained overall adequate functioning with the benefit of routine conservative treatment with prescribed medication and was progressing in college studies, albeit with difficulty and with the benefit of receiving accommodations for her mental functional limitations." (*Id.* at 36-37, 65-66, 91-92.)

Claimant argued that this discussion was insufficient to meet the narrative discussion requirements outlined above or to comport with substantial evidence. (DN 13, at PageID # 2690-95.) "Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."). However, the Court examines the record as a whole, including whatever evidence "in the record fairly detracts from its weight," without "resolv[ing] conflicts in evidence or decid[ing] questions of credibility" to determine whether an ALJ's decision is supported by substantial evidence. *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (quoting in part *Abbott v*, 905 F.2d at 923, and citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)). Thus, where an ALJ has "improperly cherry picked evidence" instead of "more neutrally [ ] weighing the evidence," his or her decision is unlikely to be supported by substantial evidence. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *see Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[S]ubstantiality of evidence evaluation does not permit a selective reading of the record."). In comparing the ALJ's discussion

to the summation provided by the Court above, the Court finds that the ALJ complied with the narrative discussion requirement and supported his RFC determination with substantial evidence.

As to the Claimant's processing speed, the ALJ did impose related mental limitations in his RFC finding.  He limited her to lower stress environments, removed jobs requiring strict quotas or involving fast-paced environments, and prohibited environments with frequent changes.  These limitations all address her processing speed and capacity to timely complete tasks.  While the Claimant likely would respond by stating that the ALJ did not do enough, the Court cannot conclude as much based on the record.  The ALJ acknowledged that Claimant's successes were not without difficulty and were based on her use of medications.  He did not ignore contrary evidence but rather painted a comprehensive picture of Claimant's mental functioning during the relevant period after which he drew the opposite conclusion to that preferred by Claimant. Claimant has cited to no provider or evaluator who imposed greater restrictions on her processing *in a work setting* than those imposed by the ALJ and has not adequately demonstrated why her functioning in an academic setting was of greater relevance to the nonexertional limitations the ALJ imposed or, in her view, should have imposed.  Given this absence and the ALJ's thorough discussion, the Court finds that ALJ's analysis of her processing speed to be supported by substantial evidence.

As to her ability to complete detailed tasks, the ALJ found Claimant could perform only *some* detailed tasks.  (R. at 32, 55-56, 81-82.)  In response, Claimant emphasized the number of accommodations she received in school to counteract her auditory processing deficits.  (DN 13, at PageID # 2690-93.)  Here again the ALJ acknowledged Claimant's receipt of accommodations but properly cited as evidence that the Claimant was able to complete school and do some work, even if it did not rise to the level of substantial gainful activity, during the relevant period.  Coupled

with the lack of functional limitations related to her ability to perform detailed tasks imposed by any provider or evaluator, the Court finds that Claimant has failed to demonstrate that the ALJ's conclusion regarding her ability to complete some detailed tasks was unsupported by substantial evidence.

It is apparent from her brief that Claimant disagrees with the ALJ's RFC analysis, but the ALJ did not selectively cite or otherwise misrepresent the record in his decision.  As courts have repeatedly recognized, "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986)).  The instant case falls squarely within that zone, and thus, the Court finds that the ALJ's RFC determination and discussion of Claimant's processing speed and ability to perform detailed tasks was supported by substantial evidence.

### b)    Combined Effect of Impairments

Claimant argued that the ALJ did not consider the combined effect of her impairments and as such his decision was not supported by substantial evidence.  (DN 13, at PageID # 2694.) Discussing multiple impairments individually does not mean the ALJ failed to consider the combined effect of those impairments where the ALJ specifically referred to a "combination of impairments" in finding that the claimant did not meet the Listings.  *Gooch v. Sec'y of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988); *Loy v. Sec'y of Health & Hum. Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990).  Here, in his step three finding regarding the Listings, the ALJ specifically noted that Claimant did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. at 30, 54, 80.)  This statement

evidences that the ALJ properly considered Claimant's impairments in combination though he may have discussed them individually in his decision.  *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851-52 (6th Cir. 2020).  Further, the ALJ also specifically noted in his CIB decisions in his RFC analysis that "the claimant's psychological symptoms and their effect on functioning have been considered together, instead of separately, regardless of the diagnostic label attached."  (R. at 58, 84.)  The combination of his step three finding and this statement convinces the Court that the ALJ did consider the combination of Claimant's impairments as required.  Thus, Claimant's argument is without merit.

**c)**      **Daily Activities**

Claimant argued that the ALJ erred in assessing her daily activities and improperly equated them with a conclusion that she could perform work.  (DN 13, at PageID # 2695.)  Though the regulations omit the term "credibility," they provide that when forming an RFC, an ALJ must assess the claimant's subjective allegations regarding his or her symptoms.  20 C.F.R. § 404.1529(a).  The regulations note that a claimant's statement that he or she is experiencing pain or other symptoms will not, taken alone, establish that he or she is disabled; there must be objective medical evidence that show the existence of a medical impairment that could reasonably be expected to give rise to the pain and/or other symptoms alleged.  *Id.*   If the ALJ finds that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must then assess the intensity and persistence of a claimant's symptoms to determine how those symptoms limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).  In doing so, the ALJ should consider a number of factors including a claimant's daily activities; the location, duration, frequency, and intensity of a claimant's pain or other symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness, and side

effects of claimant's medications; and any other measures a claimant may use to alleviate pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); *see also  Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929).

Here, the ALJ noted that Claimant engaged in a number of daily activities and found that the same were "largely unremarkable."  (R. at 34.)  Based on how the ALJ referred to Claimant's activities and his extensive discussion of the medical and other evidence discussed above, the Court cannot conclude the ALJ improperly equated her daily activities with Claimant's ability to work as she contended.  Instead, he merely considered her activities as one factor in assessing her subjective allegations as required by the applicable regulations.  The Court finds that Claimant has failed to demonstrate any reversible error in the ALJ's analysis.

### d)  Opinion Evidence

Claimant also argued that the ALJ improperly assessed the opinion evidence of record. (DN 13, at PageID # 2696-98.)  In particular, Claimant took issue with the ALJ's assessment of the opinions of the state agency psychological consultants, Dr. Teeple, Dr. Brame, and Brown. (*Id.*)  The new regulations for evaluating medical opinions are applicable to Claimant's case because she filed her applications after March 27, 2017.  Pursuant to 20 C.F.R. § 404.1520c, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[6]  20 C.F.R. § 404.1520c(a).  Instead,  an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(a), (c).  The regulations provide that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she]

---

[6] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions.  20 C.F.R. § 404.1527(c)(2) (2022).

considered the supportability and consistency factors for a medical source's medical opinions."
20 C.F.R. § 404.1520c(a), (b)(2).  An ALJ is not required to explicitly discuss how he or she
weighed the other regulatory factors of relationship with the claimant, specialization, and other
factors.  20 C.F.R. § 404.1520c(b)(1)-(2).  The Court will consider the ALJ's assessment of the
opinions of the state agency psychological consultants, Dr. Teeple, Dr. Brame, and Brown below.

### (1)      State Agency Psychological Consultants

Claimant argued that the ALJ erred in finding the opinion of the state agency psychological
consultants only somewhat persuasive, relying in part on the fact that the state agency consultants'
opinion only considered part of the record.  (DN 13, at PageID # 2696.)  She also faulted the
consultants for not including greater limitations related to her processing speed.  (*Id.*)  The Court
has already found the ALJ's analysis and limitations related to Claimant's processing speed were
supported by substantial evidence and consistent with the record.  The Court likewise rejects that
the state agency psychological consultants' opinions are flawed for failure to include those same
additional limitations proposed by Claimant for the reasons set forth above.

As to Claimant's remaining argument, pursuant to the applicable regulations, ALJs must
consider the medical findings of state agency medical and psychological consultants because they
"are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. §
404.1513a(b)(1) (2022).  There will always be a gap between the time the agency experts review
the record and give their opinion and the time the hearing decision is issued.  *See Kelly v. Comm'r*
*of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009).  "Absent a clear showing that the new evidence
renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense
and delay of a judicial remand."  *Id.*; *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26,
32 (6th Cir. 2009).  Here, the ALJ provided an extensive discussion of the medical evidence that

pre- and post-dated the state agency psychological consultants' review. That evidence does not so clearly invalidate the state agency psychological consultants' opinions so as to render reliance on the same untenable. Claimant faulted the ALJ for not explaining how the state agency consultants' opinion was consistent with the whole record, "especially the evidence that came in after February 9, 2019, the date of their last opinion." (DN 13, at PageID # 2696.) This argument is perplexing given that the Claimant only challenges the ALJ's finding regarding her onset date. As set forth above, the ALJ found Claimant disabled on and after May 1, 2017, and thus, the only information relevant to the instant issues before the Court is that dated before May 1, 2017. Claimant fails to delineate how evidence after that period was relevant to Claimant's functioning during it. Accordingly, the Court finds that Claimant's argument regarding any error in the ALJ's assessment of the state agency psychological consultants opinions is without merit.

### (2)    Dr. Teeple

Claimant argued that the ALJ erred in his assessment of Dr. Teeple's opinion and in finding that it was "remote" to Claimant's functioning in 2017. (DN 13, at PageID # 2696.) In his DIB decision, the ALJ found Dr. Teeple's opinion to be unpersuasive because it was "too remote to be representative of Claimant's level of functioning in 2017." (R. at 35.) In his CIB decision, the ALJ found Dr. Teeple's opinion only "minimally persuasive," noting that the purpose of Dr. Teeple's evaluation was "to clarify the claimant's current diagnosis and academic and vocational aptitudes." (*Id.* at 64, 90.) The ALJ also noted that Dr. Teeple did not provide a "function by function assessment regarding the nature and degree to which [Claimant] was 'compromised' with regard to her abilities and limitations for performing various types of occupations or basic work activities." (*Id.*) Dr. Teeple's focus on Claimant's academic performance is supported by the Court's review of his evaluation above, and the ALJ's characterization of the findings absent from

Dr. Teeple's opinion is also correct.  Claimant does not even reference the ALJ's evaluation of Dr. Teeple's opinion in his CIB decision in her brief, though the latter seems to the Court of much greater relevance to the period at issue in the instant decision, i.e. was Claimant disabled prior to May 1, 2017.  Claimant noted at the outset of her brief that she would "use the ALJ's decision on her Disability Insurance Claim as the primary basis of reference" in her brief because "the issue in all three decisions is the same—the onset date."  (DN 13, at PageID # 2688.)  Claimant wholly failed to recognize that while the issue may have been the same, the ALJ's analysis differed significantly in the two decisions.  This failure deprives Claimant's argument regarding Dr. Teeple's opinion of a cogent basis because Claimant has failed to focus on the ALJ's analysis most directly related to the onset period at issue.  In view of this lack of argument and the accuracy of the ALJ's characterization of Dr. Teeple's opinion, the Court finds that ALJ's discussion sufficient and supported by substantial evidence.

### (3)      Dr. Brame

Claimant argued that the ALJ erred in his assessment of Dr. Brame's opinion because her opinion was "substantiated by and consistent with all evaluations, psychological and vocational, in the record as a whole."  (DN 13, at PageID # 2697.)  In his DIB and CIB decisions, the ALJ found Dr. Brame's opinion only minimally persuasive.  (R. at 36, 65, 91.)  In doing so, the ALJ emphasized that—as with Dr. Teeple—Dr. Brame was focused on Claimant's academic performance and did not provide a function by function assessment of Claimant's ability to work.  (*Id.*)  As with Dr. Teeple, the Court finds that ALJ's analysis of the purpose of Dr. Brame's opinion and the findings absent from it to be correct.  The ALJ concluded by saying that Claimant's functional abilities, as evidenced in the record as a whole, were more consistent with the RFC he found elsewhere in his decision.  (*Id.*)  The Court finds that this analysis more than satisfies the

27

applicable regulations.  The ALJ considered the substantive findings cited by Dr. Brame elsewhere in his decision but in assessing the persuasiveness of her opinion properly noted the difference between academic and work settings that went unaddressed by Dr. Brame.  Claimant cited no authority to dispute that this was valid distinction for the ALJ to draw.  Thus, the Court finds Claimant's argument about any error in the ALJ's discussion of Dr. Brame's opinion to be without merit.

### (4)    Brown

Claimant also argued that the ALJ erred in his assessment of the opinion of Brown, who performed a vocational evaluation of Claimant.  (DN 13, at PageID # 2697-98.)  Claimant's argument appears to be nothing more than an incorporation of her claim, rejected by the Court above, that greater limitations related to Claimant's processing speed should have been incorporated into the ALJ's determination of her RFC.  The Court has already found the ALJ's conclusion on this issue supported by substantial evidence.  While Brown's opinion does reference a need for Claimant to have additional time to complete academic tasks, Claimant's argument regarding the ALJ's assessment of Brown's opinion provides no more of a reason to dispute the ALJ's RFC determination than her general argument dispensed with above.  As Claimant has not articulated an independent challenge to the procedural or substantive discussion of Brown's opinion in the ALJ's decisions, the Court finds her arguments of error to be without merit.

### e)    Alleged *Res Judicata* Issue

Claimant argued that a statement in the ALJ's decision raised a question that the ALJ improperly relied on a decision made in a separate social security proceeding without doing the required analysis under *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840-43 (6th Cir. 1997). (DN 13, at PageID # 2698.)  In his DIB decision, the ALJ stated that in making his RFC finding,

he "ha[d] allowed the claimant every benefit of the doubt in continuing and carrying forward the residual function finding from a prior period at issue between January 2010 and the claimant's attainment of age 22 in March 2013. However, the total medical and other evidence weighs against a finding of disability or additional or greater functional limitation." (R. at 35.) Claimant alleged that this was a reference to a prior decision granting her supplemental security income benefits that was not part of the record. The Court agrees with the Commissioner that Claimant has misread the ALJ's DIB decision. Whether Claimant was disabled between January 2010 and when she attained age twenty-two in March 2013 is a reference not to some outside decision but to the ALJ's analysis in the separate CIB decisions in the instant record as that is the relevant period by which Claimant had to establish disability in order to be entitled to CIB benefits. It was Claimant, not the ALJ, who noted that she was receiving supplemental social security income benefits during the hearing, and the ALJ did follow up on that statement. (*Id.* at 106, 100-23.) In view of the total lack of reference in either the hearing or the ALJ's decisions to receipt of other benefits and the obvious reference to CIB in the ALJ's challenged statement, the Court will not permit Claimant to manufacture a *res judicata* issue and will not presume that the ALJ acted improperly without supporting evidence.

### f)    RFC Generally

Based on the conclusions above, the undersigned finds that the ALJ's RFC determination was supported by substantial evidence. His analysis more than surpasses the threshold for substantial evidence, which is "not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. And whatever the meaning of

'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."). Claimant did nothing more than point to other evidence in the record she claimed supported an opposite conclusion to that reached by the ALJ. However, this Court's role is not to second-guess the ALJ's conclusions. *Gayheart*, 710 F.3d at 374; *Smith*, 893 F.2d at 108; *Ulman*, 693 F.3d at 714.

### 3.    Step Five

Claimant also argued that the ALJ's step five findings were in error because the hypothetical questions the ALJ posed to the vocational examiner ("VE") did not accurately portray Claimant's impairments. (DN 13, at PageID # 2699.) At step five, the ALJ has the burden of demonstrating that there exists a significant number of jobs in the national economy that the claimant can perform given his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v), (g); 20 C.F.R. § 404.1560(c) (2022); *Jordan*, 548 F.3d at 423. The Commissioner may meet this burden by relying on expert vocational testimony received during the hearing to determine what jobs exist in significant numbers in the economy that the claimant can perform considering the combination of his or her limitations. *See, e.g.*, *Fry v. Comm'r of Soc. Sec.*, 476 F. App'x 73, 76 (6th Cir. 2012); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). But a VE's testimony can constitute substantial evidence to support the Commissioner's finding that a claimant is capable of performing a significant number of jobs existing in the economy, *Bradford v. Sec'y Dep't. of Health & Hum. Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (per curiam), only so long as the VE's testimony is based on a hypothetical question that "accurately portrays [a claimant's] individual physical and mental impairments." *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). *See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th

Cir. 1996). "However, the ALJ is only required to incorporate into the hypothetical questions those limitations which have been accepted as credible." *Hare v. Comm'r of Soc. Sec.*, 37 F. App'x 773, 776 (6th Cir. 2002); *see also Stanley v. Sec'y of Health & Hum. Servs.,* 39 F.3d 115, 118-19 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals.")). The undersigned has already found above the that ALJ's determination of Claimant's RFC was supported by substantial evidence. Thus, the ALJ was not required to include additional limitations related to these capacities in his hypothetical to the VE, and the VE's testimony constitutes substantial evidence to support her step five determination.

Accordingly, the undersigned finds that Claimant has failed to demonstrate any reversible error in the ALJ's step five analysis.

## III.   CONCLUSION AND ORDER

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**. A final judgment will be entered separately.

cc:     Counsel of Record